### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Corey Gaynor, | |
| *Petitioner,* | CIVIL ACTION |
| v. | Nos. 23-3562; 23-3708 |
| Kenneth Hollibaugh, et al., | |
| *Respondents.* | |

**Pappert, J.**                                                    **February 10, 2025**

## <u>MEMORANDUM</u>

Corey Gaynor—currently serving a life sentence for first-degree murder—seeks a writ of habeas corpus under 28 U.S.C. § 2254. Magistrate Judge Carol Sandra Moore Wells issued a Report and Recommendation recommending denial of Gaynor's petition, to which Gaynor objected. After thoroughly reviewing the record, the Court overrules the objections, adopts the R&R and denies the petition.

### I

### A

Gaynor was convicted by a jury on March 2, 2016 for the April 14, 2014 murder of Timothy Cary. (Tr. Verdict/Sentencing, ECF No. 12-11.) Evidence at trial showed that Gaynor and Cary engaged in a verbal altercation in a bar, and that after briefly leaving the bar (apparently to retrieve a handgun), Gaynor returned and confronted Cary before shooting him repeatedly. (Tr. Jury Trial Feb. 23, 2016 No. 2, 41:1–8, ECF No. 12-5); (Tr. Jury Trial Feb. 24, 2016, 13:17–14:15, 54:23–55:1 ECF No. 12-6); (Tr. Jury Trial Feb. 25, 2016, 37:17–25, 94:21–25, ECF No. 12-7.)

Three eyewitnesses identified Gaynor as the shooter. Cary's girlfriend, Leticia Samuels, witnessed the initial verbal altercation between Cary and Gaynor. (Tr. Feb. 25 at 34:20–35:22.) She also witnessed Gaynor and Cary speaking to one another outside the bar; she testified that Cary eventually said to Gaynor, "So what you wanna do?" (*Id.* at 37:12–16.) Samuels then witnessed Gaynor pull out a gun and shoot Cary repeatedly, including after Cary had already fallen to the ground. (*Id.* at 37:17–25.) After the shooting, she and Gaynor looked directly at one another from about fifteen feet apart before Gaynor fled the scene. (*Id.* at 38:24–39:18.) Later that same night, Samuels identified Gaynor as the shooter to the police. (*Id.* at 40:23–41:9.)

Timothy McElveen, an "associate" of Cary's, also witnessed the initial verbal dispute and the shooting. (Tr. Feb. 23 No. 2, at 37:14, 41:1–8, 40:21–23.) Following the shooting, McElveen drove after Gaynor and took a picture of him fleeing the scene. (*Id.* at 43:21, 62:1-2.) When McElveen eventually tracked Gaynor down, the police had apprehended him. (*Id.* at 45:1–3.) McElveen immediately told the police "that was him." (*Id.*)

At trial, McElveen expressed much less certainty about the shooter's identity. *See, e.g.*, (Tr. Feb 23 No. 2 at 42:7–10.) Gaynor's appearance had apparently changed between the night of the shooting and the trial. *See* (Tr. Feb. 24 at 97:25–98:12); (Tr. Feb. 25 at 41:19–42:6); (Tr. Feb. 26 No. 1 at 16:16–17:4.) McElveen also testified that he was drunk on the evening in question. (Tr. Feb. 23 No. 2 at 45:14.) And at the end of his direct examination, McElveen testified that he was fearful of being labeled a snitch for testifying and that he would not have done so had the prosecution not subpoenaed him. (*Id.* at 45:18–46:3.) During their closings, defense counsel and the

prosecutor both spoke about whether McElveen's fear was well-founded and whether the jury should credit his new uncertainty about the shooter's identity. (Tr. Feb. 26, 2016 No. 3, 12:6–15, 18:8–19:2, ECF No. 12-10); (Tr. Feb. 23, 2016 No. 1, 18:8–22:2, ECF No. 12-4.)[1]

The third testifying eyewitness was Kareema Burton, who knew neither Gaynor nor Cary before the night in question. (Tr. Feb. 23 No. 2 at 100:5–9.) She testified that Gaynor was standing about three feet from her, and that although she did not actually see him pull the trigger, she heard the gunshots ring out from where she knew he was standing. (*Id.* at 103:24–104:17, 121:2–122:5.) She also testified that she was able to see his face before he started shooting. (*Id.* at 121:2–122:5.) Shortly after the shooting, Burton identified Gaynor as the shooter to the police. (*Id.* at 122:3–5.)

The police arrested Gaynor within minutes of the shooting in a location consistent with the flight path described by the eyewitnesses. (Tr. Feb. 24 at 97:12–24); (Tr. Feb 23 No. 2 at 61:7–13.) Gaynor matched the description given by the eyewitnesses, and his sweatshirt was covered in gunshot residue. (Tr. Feb. 23 No. 2 at 64:8–11); (Tr. Jury Trial Feb. 26, 2016 No. 1, 22:1–6, ECF No. 12-8); (Tr. Feb. 25 at 133:19–134:2.) The police also recovered along Gaynor's route a semi-automatic .45 caliber Glock firearm, which, according to forensic testing, matched the murder weapon. (Tr. Feb. 24 at 130:11–14, 147:12–148:15, 169:14–170:21.)

### B

Upon conviction, the trial court sentenced Gaynor to life imprisonment without the possibility of parole. (Tr. Verdict/Sentencing 7:9–17.) The Pennsylvania Superior

---

[1]    The transcript of the prosecutor's closing arguments is misdated as February 23, 2016, which is before most of the evidence was presented, but the Court will cite the transcript as labeled.

Court affirmed the judgment on appeal, *Commonwealth v. Gaynor*, No. 2654 EDA 2016, 2017 WL 4679670, at *1 (Pa. Super. Ct. Oct. 18, 2017), and the Supreme Court of Pennsylvania denied allocatur, *Commonwealth v. Gaynor*, 212 A.3d 1003 (Pa. 2019).

Gaynor then filed a petition pursuant to Pennsylvania's Post-Conviction Relief Act and raised claims of ineffective assistance of trial counsel based on counsel's failure to (1) object to an instruction permitting the jury take Gaynor's use of an unregistered firearm as evidence that Gaynor intended to kill Cary; (2) raise various objections to McElveen's and Burton's identification of Gaynor on the ground that they were the product of unduly suggestive circumstances; (3) object to evidence of McElveen's fear of testifying for the Commonwealth and comments in the prosecutor's closing about the same; and (4) object as a violation of the Confrontation Clause to the introduction of a photograph of Gaynor that McElveen retrieved from Instagram and gave the police. *See* (Pet'r.'s Super. Ct. Br., ECF No. 12-18.)

The PCRA Court denied all four claims and the Superior Court affirmed. *See Commonwealth v. Gaynor*, No. 1726 EDA 2021, 2022 WL 2764814, at *3, *12 (Pa. Super. Ct. 2022). The Supreme Court of Pennsylvania again denied allocatur. *Commonwealth v. Gaynor*, 288 A.3d 1293 (Pa. 2022). Gaynor then filed this petition and raised the same four claims as in his PCRA petition.[2] Judge Wells's R&R recommends denying all four on the ground that the Superior Court's resolution of the

---

[2]    Gaynor filed a *pro se* petition under Civ. A. No. 23-3562 and a counseled petition under Civ. A. No. 23-3708. Each petition raised the same claims, so Judge Wells consolidated the cases, ordered the parties to file all documents under case 23-3562, and disposed of the petitions in a single R&R. *See* (Order, Nov. 15, 2023, ECF No. 8 in Case 23-3562 and ECF No. 3 in Case 23-3708); (R&R, ECF No. 13.) Gaynor never objected to the consolidation, so the Court also disposes of both petitions in this memorandum and accompanying order. Unless otherwise noted, all citations to ECF Numbers correspond to the docket in case 23-3562.

claims was not contrary to, nor involved an unreasonable application of, clearly established federal law. *See* (R&R.)  Gaynor objects to Judge Wells's conclusions with respect to his first three claims, but not the fourth. *See* (Objs., ECF No. 14.)

II

A

28 U.S.C. § 2254 bars the Court from granting habeas relief on any claim that a state court has already adjudicated on the merits unless the state court's adjudication (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the" United States Supreme Court; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  "Clearly established" federal law consists only of "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *Andrew v. White*, No. 23-6573, 604 U.S. ----, slip op. at 5 (Jan. 21, 2025) (per curiam) (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014)).  A legal principle upon which the Supreme Court relies to decide a case is a "holding" for AEDPA purposes. *Id.* at 6.

The "contrary to" clause permits a court to grant the writ if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). The "unreasonable application" clause permits a court to grant the writ if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

5

Whether a state court's application of federal law is "unreasonable" is judged objectively.  *Id.* at 409–10.  "[A]n application may be incorrect but still not unreasonable," *Duncan v. Morton*, 256 F.3d 189, 196 (3d Cir. 2001), so a petitioner must show that the state court's error is "well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013).  But a federal habeas court generally must also review the state court's opinion on its own terms and "may not speculate as to theories that 'could have supported' the state court's decision.*" Dennis v. Sec'y, Pa. Dep't of Corrs.*, 834 F.3d 263, 283 (3d Cir. 2016) (en banc).[3]

Finally, a decision is not based on an unreasonable determination of facts "merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).  If "'[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's ... determination.'" *Id.* (quoting *Rice v. Collins*, 546 U.S. 333, 341–342 (2006) (alteration in original)).[4]  But "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review," and "does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

---

[3]    Only when the federal court "cannot be sure of the precise basis for the state court's ruling" may the federal court "gap fill[]" and speculate about reasonable theories. *Dennis*, 834 F.3d at 283.

[4]    In the Third Circuit, § 2254(d)'s "reasonableness" standard applies to a federal habeas court's review of "ultimate factual determination[s]" by the state court. *Williams v. Beard*, 637 F.3d 195, 204 n.7 (3d Cir. 2011).  For "subsidiary" factual determinations, a habeas court may only overturn the state court's conclusion upon a showing by the petitioner "that there is clear and convincing evidence to the contrary." *Id.*  And "even if a state court's individual factual determinations are overturned, what factual findings remain to support the state court decision must still be weighed under the overarching standard of section 2254(d)(2)." *Id. (quoting Lambert v. Blackwell*, 387 F.3d 210, 235–236 (3d Cir. 2004).

If a federal habeas court determines that a petitioner meets one of § 2254(d)'s exceptions, the court "must then resolve the claim without the deference [§ 2254(d)] otherwise requires." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007).

B

To succeed on a claim for ineffective assistance of counsel, a petitioner must show that (1) his "counsel's performance was deficient," and (2) he suffered prejudice as a result. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Both prongs are "mixed questions of law and fact." *Id.* at 698.

Counsel's performance is deficient when it falls "below an objective standard of reasonableness." *Id.* at 687–88. In cases where a state court has already passed on the merits of an ineffective-assistance claim, the federal habeas court's review is "doubly" deferential, so as "to afford both the state court and the defense attorney the benefit of the doubt." *Woods v. Donald*, 575 U.S. 312, 316 (2015).

To establish prejudice, the petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). Counsel cannot be found to be ineffective for failing to pursue a meritless claim. *See United States v. Bui*, 795 F.3d 363, 366–67 (3d Cir. 2015).

III

The Court reviews *de novo* the specific portions of the R&R to which Gaynor

objects.  28 U.S.C. § 636(b)(1); *see also Cont'l Cas. Co. v. Dominick D'Andrea, Inc.*, 150

F.3d 245, 250 (3d Cir. 1998).[5]

A

Gaynor claims his trial counsel was Constitutionally ineffective for failing to

object on due process grounds to the following jury instruction:

> If you find that the defendant used a firearm in committing the acts that
> are charged in this case, which is murder, and that the defendant did not
> have a license to carry that firearm as required by law, you may regard that
> as one of the items of circumstantial evidence on the issue of whether the
> defendant intended to commit the crime of murder as is charged in this
> case. It is for you to determine what weight, if any, you will give to that
> item of circumstantial evidence. Evidence of non-licensure alone is not
> sufficient to prove that the defendant intended to commit the offense of
> murder.

(Tr. Feb. 26 No. 1 at 87:3–17.) The Superior Court rejected Gaynor's claim, holding that

an objection on due process grounds would have been meritless.  *Gaynor*, 2022 WL

2764814, at *5.  Gaynor says the Superior Court's analysis involved an unreasonable

application of the rule set forth in *County Court of Ulster County, New York v. Allen*,

442 U.S. 140, 157 (1979): an instruction containing a permissive inference[6] only violates

---

[5]    For portions of the R&R to which no objection is made, "a district court is not required to
determine *de novo* whether a magistrate judge erred" in denying such claims. *Medina v.
Diguglielmo*, 461 F.3d 417, 426 (3d Cir. 2006) (citing Fed. R. Gov. § 2254 Cases 8(b)).  As a matter of
good practice, however, courts generally review unobjected-to claims for clear error. *See, e.g., Harris
v. Mahally*, No. 14-2879, 2016 WL 4440337, at *4 (E.D. Pa. Aug. 22, 2016).  The Court reviewed
Judge Wells's conclusion with respect to Gaynor's fourth claim, to which Gaynor did not object, and
perceives no clear error.

[6]    A "permissive inference suggests to the jury a possible conclusion to be drawn if the State
proves predicate facts [] but does not require the jury to draw that conclusion." *Francis v. Franklin*,
471 U.S. 307, 314 (1985).  A mandatory presumption, by contrast, "instructs the jury that it must
infer the presumed fact if the State proves certain predicate facts." *Id.*  Gaynor briefly argues that
the Superior Court erred in concluding that the challenged instruction involved a permissive

a defendant's due process rights "if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference." *Id.* This "rational inference" rule requires the court to consider the whole factual record developed at trial, including "evidence in the record other than the presumption to support a conviction." *Id.* at 160. The *Ulster County* rule is a general one, so state courts have substantial leeway in "case-by-case determinations." *See Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).[7]

The Superior Court first explained that the trial evidence supported the basic facts necessary for the inference to be applicable; *i.e.*, that Gaynor shot Cary with a firearm he was not licensed to carry. *Gaynor*, 2022 WL 2764814, at *5. The Superior Court also analogized to the Pennsylvania Supreme Court's opinion in *Commonwealth v. Hall*, 830 A.2d 537, 549 (2003), which explained that the use of an unlicensed firearm "suggests the stealth by which many criminal objectives are furthered and achieved." *Id.* at 253–54; *see also id.* at 254 (quoting *Com. v. Sattazahn*, 631 A.2d 597, 606 n.6 (1993) ("[o]ne who envisions no criminal purpose for the firearm is unlikely to refuse, if required, to declare his ownership of that weapon to the proper authorities, while one who harbors criminal intentions will").

---

inference rather than a mandatory presumption, but the instruction's use of the word "may" renders Gaynor's argument meritless. *See, e.g.*, *Kress v. New Jersey*, 455 F. App'x 266, 272 (3d Cir. 2011).

[7]       The *Ulster County* rule is somewhat paradoxical in that it requires courts to determine whether one fact rationally implies another by, at least in part, evaluating the extent to which other facts independently support the fact to be inferred. But that analysis is what *Ulster County* instructs courts to undertake. *See Ulster County*, 442 U.S. at 159–60 (explaining that the amount of evidence in the record other than the presumption is relevant to analysis of a permissive presumption); *id.* at 164–65 (holding that the inference in question did not violate due process because the fact to be inferred was supported by numerous facts other than the fact on which the presumption was based).

And finally, the Superior Court recited numerous other facts supporting the conclusion that Gaynor intended to kill Cary. For one, Gaynor's trip to his car and back were consistent with retrieving a gun before the fatal confrontation. Additionally, eyewitnesses testified that Gaynor fired multiple shots at Cary's vital organs and continued shooting even after Cary had fallen to the ground. *Gaynor*, 2022 WL 2764814, at *5. The Superior Court's analysis was reasonable; it followed the dictates of *Ulster County* and comports with other courts' application of the rule. *See McCandless v. Beyer*, 835 F.2d 58, 61–63 (3d Cir. 1987) (upholding a permissive-inference instruction after explaining that (1) the inference in question was generally a sensible one and (2) the factual record contained ample independent evidence of the fact to be inferred).

Upon concluding that the permissive inference was rational, the Superior Court reasonably concluded that a due process objection to the instruction would have been meritless and that trial counsel therefore could not have been ineffective for failing to raise it. *Gaynor*, 2022 WL 2764814, at *5. That was a reasonable application of *Strickland*. *Bui*, 795 F.3d at 366–67.

B

Gaynor next claims that his trial counsel was ineffective for failing to move to suppress McElveen's out-of-court and in-court identifications of Gaynor and Burton's out-of-court identification of Gaynor, and for failing to request a cautionary instruction about those identifications pursuant to *Commonwealth v. Kloiber*, 106 A.2d 820 (Pa. 1954).

10

1

Gaynor claims that trial counsel should have moved to suppress McElveen's out-of-court identification because the police had already apprehended Gaynor by the time McElveen identified him. *See* (Pet. 22); (Objs. 5–6). These circumstances, Gaynor argues, created unduly suggestive circumstances and a substantial likelihood that McElveen misidentified Gaynor as the shooter. *Id.* He also claims that counsel should have objected to any in-court identification by McElveen, ostensibly because the unduly suggestive circumstances of the out-of-court identification rendered the likelihood of misidentification irreparable. *See* (Pet. 22–23); *see also Simmons v. United States*, 390 U.S. 377, 384 (1968). According to Gaynor, McElveen's identification of him was "primarily" a product of McElveen seeing Gaynor in police custody close to the crime scene, rather than McElveen's own independent recollection of the shooter's physical appearance. (Pet. 22–23.)

The Superior Court first concluded that any objection to McElveen's out-of-court identification would have been meritless. *Gaynor*, 2022 WL 2764814, at *6. Gaynor argues that the Superior Court's analysis involved an unreasonable application of the rule set out in *Manson v. Braithwaite*, 432 U.S. 98, 114 (1977). *See* (Objs. 4.) In *Manson*, the Supreme Court reiterated the rule it previously announced in *Neil v. Biggers*, 409 U.S. 188, 198–99 (1972): an out-of-court identification violates a defendant's due process rights if (1) it resulted from an unnecessarily suggestive procedure, and (2) the identification is insufficiently reliable. *See Perry v. New Hampshire*, 565 U.S. 228, 238–240 (2012). Whether an out-of-court identification is insufficiently reliable—or, in other words, there is a "substantial likelihood of

11

misidentification"—is judged by a totality-of-the-circumstances approach, weighing at least the five following factors: (1) "the opportunity of the witness to view the criminal at the time of the crime," (2) the witness's "degree of attention," (3) the accuracy of the witness's description of the criminal, (4) the witness's "level of certainty," and (5) the length of time between the crime and identification. *Biggers*, 409 U.S. at 200–01. The *Biggers* test for reliability is a general one, so the Superior Court's application of it to this case must be given substantial leeway. *See Harrington*, 562 U.S. at 101.

The Superior Court accurately recited the *Biggers* rule and weighed the relevant factors. *See Gaynor*, 2022 WL 2764814, at *6. Specifically, the court emphasized that "McElveen had ample time to observe [Gaynor] inside and outside the bar," that McElveen chased after Gaynor and took a picture of him as he fled, and that McElveen confidently volunteered, without prompting from police, that Gaynor was the perpetrator. *Id.* This analysis reflects that at least the first, second, fourth, and fifth *Biggers* factors cut in favor of reliability. Gaynor says this analysis was unreasonable because at trial, McElveen testified to being drunk at the time of the identification and was less certain than he had been on the night of the shooting that Gaynor was the perpetrator. (Objs. 4 (citing Tr. Feb. 23 No. 2 at 39:19–25, 42:11–16, 45:10–14).) But nearly two years had passed since the night of the shooting, and witnesses testified that Gaynor's appearance had changed in the interim. *See* (Tr. Feb. 24 at 97:25–98:12); (Tr. Feb. 25 at 41:19–42:6); (Tr. Feb. 26 No. 1 at 16:16–17:4.) McElveen was also fearful about the consequences of "snitching." *See* (Tr. Feb 23 at 45:15–46:3.) Reasonable jurists could thus give McElveen's professed uncertainty at trial little weight in determining the reliability of his prior identification of Gaynor as the shooter.

The Superior Court also concluded that because the out-of-court identification was sufficiently reliable, it could not have tainted any in-court identification and therefore an objection to McElveen identifying Gaynor in court would have been meritless. *Gaynor*, 2022 WL 2764814, at *7 n.3. The *Biggers* test for reliability would govern the question of whether the out-of-court identification tainted any in-court identification, so the Superior Court's conclusion was reasonable. *See Manson*, 432 U.S. at 106 n.9; *see also Lunsford v. Adm'r New Jersey State Prison*, No. 21-2134, 2024 WL 3356993, at *2 (3d Cir. July 10, 2024) ("An in-court identification can be suppressed under the Due Process Clause only if it was influenced by a suppressible out-of-court identification."). And because it reasonably concluded that Gaynor's proffered objections would be meritless, the Superior Court also reasonably concluded that his trial counsel could not have been ineffective for failing to raise them. *Bui*, 795 F.3d at 366–67.

2

Gaynor next claims that his trial counsel was ineffective for failing to seek suppression of Burton's out-of-court identification. Burton identified Gaynor to the police as the shooter pursuant to a "show up" procedure—the police took Burton to the police car in which they were holding Gaynor and then pulled Gaynor out of the car in handcuffs and asked Burton if he was the shooter. (Tr. Feb. 23 No. 2 at 117:1–21.) Gaynor thus argues that Burton only identified him as the shooter because she saw him "being taken from a [police] vehicle." (Objs. 6.)

The Superior Court concluded that any objection to the out-of-court identification by Burton would have been meritless. *Gaynor*, 2022 WL 2764814, at *6. Again

applying the rule from *Biggers* and *Manson*, the Superior Court concluded that whatever "corrupting effect" the show-up procedure may have had, that effect was outweighed by "other indicia of reliability." *Id.* Specifically, the court noted that, immediately before the shooting, Burton viewed Gaynor's face while standing right next to him in a well-lit area outside the bar, and that Burton identified Gaynor mere minutes after the shooting. *Id.*; *see also* (Tr. Feb. 26 No. 1 at 14:21–15:4, 20:23–25.) Accordingly, the Superior Court reasonably determined that at least the first, fourth, and fifth *Biggers* factors weighed in favor of reliability.

Gaynor makes much of the fact that Burton did not actually see Gaynor pull out the gun and shoot Cary,[8] (Pet. 20); (Objs. 4), but a reasonable jurist could deem that irrelevant to the reliability analysis under *Manson* and *Biggers*. That analysis asks whether an identification was rendered unreasonable by undue suggestion by law enforcement; it does not turn on whether the witness actually saw the crime unfold. *See, e.g.*, *Grayer v. McKee*, 149 F. App'x 435, 438, 446 (6th Cir. 2005) (holding state court's application of *Biggers* factors to identification by witness who did not see the crime unfold was reasonable).

Because the Superior Court reasonably concluded that an objection to Burton's identification would be meritless, it also reasonably concluded that his trial counsel could not have been ineffective for failing to raise it. *Bui*, 795 F.3d at 366–67.

---

[8]    Burton formed her opinion about the shooter's identity because Gaynor was standing "right next to" her at the same time she heard gunshots from "right next to" her. *See* (Tr. Feb. 23 No. 2 at 118:10–14, 120:12–14).

3

Gaynor also claims his trial counsel was ineffective for failing to request a so-called "*Kloiber* charge" with respect to the identifications by McElveen and Burton. (Objs. 7–9.)  A *Kloiber* charge is a cautionary instruction about eyewitness testimony available in some circumstances under Pennsylvania law.  *See Commonwealth v. Ali*, 10 A.3d 282, 303 (Pa. 2010).  The Superior Court concluded that a request for a *Kloiber* charge with respect to either witness would have been meritless because none of the circumstances for which such a charge is warranted were present.  *Gaynor*, 2022 WL 2764814, at *7–8.  This Court cannot review that state-law determination.  *Priester v. Vaughn*, 382 F.3d 394, 402 (3d Cir. 2004).  The Superior Court then reasonably concluded that Gaynor's trial counsel could not have been ineffective for failing to raise a meritless request.  *Id.*

C

Gaynor next claims that his trial counsel was ineffective for failing to object to the admission of evidence and argument by the prosecutor suggesting that McElveen was afraid he would be labeled a snitch for testifying in favor of the Commonwealth. (Pet. 29–37.)  Specifically, McElveen and a police officer testified that McElveen would not have appeared in court had he not been subpoenaed, that he was afraid of being "branded a snitch," and that "people in the neighborhood" had called him a snitch.  (Tr. Feb. 23 No. 2 at 29:10–20, 45:15–23, 45:25–46:3, 67:12–25); (Tr. Feb 26 No. 1 at 28:14–29:20.)  The prosecutor revisited this evidence during closing argument, describing McElveen as a "hero" for identifying Gaynor on the night of the shooting and arguing that McElveen only expressed uncertainty about the shooter's identification in court

because he was scared that people from his neighborhood would watch his testimony
and learn that he "gave evidence to the Commonwealth." *See* (Tr. Feb 23 No. 2 at 18:8–
22:2.)  The prosecutor's comments were in response to a statement in the defense's
closing that McElveen "didn't look [scared] to [him]."  (Tr. Feb 26 No. 3 at 12:6–15,
18:8–19:2.)

1

The Superior Court held that the evidence of McElveen's fear was admissible on
state-law grounds.  *Gaynor*, 2022 WL 2764814, at *8.  The Court may not review that
conclusion.  *Priester*, 382 F.3d at 402.  But Gaynor also argued to the Superior Court
that admission of the evidence violated his due process rights.  (Pet'r.'s Super. Ct. Br.
36.)  The Superior Court did not address the due process argument, so the Court
reviews it *de novo*.  *Simmons v. Beard*, 590 F.3d 223, 231 (3d Cir. 2009).

The Due Process Clause prohibits the admission of evidence "that is so unduly
prejudicial that it renders the trial fundamentally unfair."  *Andrew*, 604 U.S. ----, slip
op at 1 (quoting *Payne v. Tennessee*, 501 U.S. 808, 825 (1991)).  Factors that help guide
the inquiry include "the relevance of the disputed evidence to the charge," "the degree of
prejudice" caused by the evidence, and "whether the trial court provided any mitigating
instructions."  *Id.* at 9–10.  "The ultimate question … is whether the evidence 'so
infected the trial with unfairness' as to render the resulting conviction … 'a denial of
due process.'"  *Id.* at 10 (quoting *Romano v. Oklahoma*, 512 U.S. 1, 13 (1994)); *see also
Collins v. Warden James T. Vaughn Corr. Ctr.*, No. 23-1797, 2024 WL 4357221, at *4
(3d Cir. Oct. 1, 2024) ("to establish a due process violation," the petitioner must show

16

that the evidence "was of such magnitude as to undermine the fundamental fairness of the entire trial") (quoting *Keller v. Larkins*, 251 F.3d 408, 413 (3d Cir. 2001).

For example, a trial is fundamentally unfair where "the principal pillar of proof" of a defendant's guilt is expert testimony based on methods later shown to be unreliable. *See Han Tak Lee v. Houtzdale SCI*, 798 F.3d 159, 166–69 (3d Cir. 2015). By contrast, a trial with significant inculpatory evidence is not fundamentally unfair merely because a detective's false testimony about what date he transcribed a statement precluded defense counsel from impeaching him. *See Collins*, No. 23-1797, 2024 WL 4357221, at *4.

Gaynor's trial was not fundamentally unfair because the prosecutor introduced evidence that McElveen was afraid of being labeled a snitch if he testified. The prosecution's stated purpose for eliciting the testimony was to demonstrate a possible motive for McElveen's lessened certainty at trial than when he initially told the police that Gaynor was the shooter. *See* (Tr. Feb 23 No. 1 at 21:8–22:2.) And the law recognizes that evidence of a witness's motive for giving certain testimony is often crucial to help a factfinder accurately weigh the witness's credibility. *See, e.g.*, McCormick on Evidence § 39 (8th Ed. 2020). So there was nothing fundamentally unfair about admitting evidence that McElveen feared the consequences of testifying in the prosecution's favor. To be sure, Gaynor contends that the evidence of McElveen's fear did not merely explain McElveen's motive; he says the questioning suggested to the jury that Gaynor and/or those associated with him were the ones causing McElveen's fear. (Pet. 34.) The Court perceives no such suggestion from any of the prosecutor's

17

questions or answers thereto.[9]  To the contrary, the police officer who first learned of McElveen's fear testified that he had no reason to believe that the people calling McElveen a snitch were associated with Gaynor.  (Tr. Feb. 26 No. 1 at 31:18–32:16.)

And even if the prosecution did not have a proper purpose for introducing the "snitch" testimony, any unfair effects that flowed from it would not have "infected" the whole trial, given the substantial evidence of Gaynor's guilt.  As explained, Gaynor's movements immediately before the shooting were consistent with retrieving a gun from his car; three eyewitnesses identified Gaynor as the shooter, including one of whom Gaynor "looked dead in [the] face" as soon as he finished shooting; and the police recovered a gun matching the murder weapon along Gaynor's route of flight and detected gunshot residue on the sweatshirt he was wearing when they apprehended him.  (Tr. Feb. 24 at 13:17–14:15, 54:13–55:1); (Tr. Feb 25 at 39:3–8); (Tr. Feb. 23 No. 2 at 45:1–3, 122:3–5); (Tr. Feb. 24 at 130:11–14, 147:12–148:15, 169:14–170:21); (Tr. Feb. 25 at 133:19–134:2.)  Accordingly, the admission of evidence that McElveen feared being labeled a snitch did not deprive Gaynor of due process, and Gaynor's trial counsel was not ineffective for failing to object on those grounds.  *Bui*, 795 F.3d at 366–67.

2

Gaynor also argues that the prosecutor's comments during the closing constituted prosecutorial misconduct and violated his right to due process.  The

---

[9]    Even if the prosecutor had elicited testimony that Gaynor was intimidating or threatening McElveen, that would have been entirely permissible if done in good faith.  Courts frequently admit evidence of a defendant's threats toward a witness to show the defendant's consciousness of guilt. *See United States v. Lingala*, 91 F.4th 685, 693 (3d Cir. 2024).

Superior Court rejected this argument on the merits,[10] and Gaynor appears[11] to argue that the Superior Court's conclusion involved an unreasonable application of the rule set out in *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974): a prosecutor has violated a defendant's due process rights if her conduct "infected the trial with unfairness." *Id.* at 643. Examples of conduct that rises to that level include "vouch[ing] for the credibility of witnesses[] or offer[ing] [a] personal opinion as to the defendant's guilt," *United States v. Robinson*, 485 U.S. 25, 33 n.5 (1988), or "suggesting by his questions that statements had been made to him personally out of court," *Berger v. United States*, 295 U.S. 78, 84 (1935). Courts examine a prosecutor's statements in context to determine their probable effect on the jury. *United States v. Young*, 470 U.S. 1, 11–14 (1985). The *Donnelly* rule is a general one, so the Superior Court has substantial leeway in its application of the rule. *See Harrington*, 562 U.S. 86 at 101.

The Superior Court concluded that the closing remarks about McElveen's professed fear of testifying did not constitute prosecutorial misconduct for at least two reasons. First, the comments "were made in fair response" to defense counsel's argument that McElveen did not appear scared. *Gaynor*, 2022 WL 2764814, at *10. And second, "the trial court instructed the jury that the arguments of counsel were not evidence." *Id.*

---

[10]    The Superior Court applied the "unavoidable prejudice" test, *Gaynor*, 2022 WL 2764814, at *9, which courts in this circuit generally treat as "materially indistinguishable" from the *Donnelly* rule, *Reid v. Beard*, 420 F. App'x 156, 160 (3d Cir. 2011).

[11]    The Court would likely be within its authority to conclude that Gaynor has not objected to this portion of the R&R, warranting *de novo* review. *See, e.g., Woodward v. Debalso*, No. 2:17-CV-224, 2019 WL 5677700, at *6 (E.D. Pa. Nov. 1, 2019) (refusing to conduct *de novo* review where the petitioner "fail[ed] to identify what is wrong with [the Magistrate Judge's] analysis on [the relevant] issue"). Gaynor merely complains that Judge Wells's analysis was too "businesslike and methodical" and that it was "long on the legal principles and short on the passions on display at trial." (Objs. at 9–10.) While hardly a specific objection, the Court will nevertheless review the claim *de novo*.

19

In his objections, Gaynor correctly identifies that the following statement from the prosecutor is cause for concern: "[McElveen] knows there are going to be relatives of people [in the courtroom] … people are going to be here and they're going to know people." (Tr. Feb 23 No. 1 at 21:16–24.)  A juror could have reasonably understood the prosecutor to be suggesting that the people McElveen was afraid of were associated with Gaynor.  That implication was improper because, as explained, there was no evidence that Gaynor or anyone associated with him was threatening McElveen.  *See United States v. Rivas*, 493 F.3d 131, 139 (3d Cir. 2007) ("one cannot make arguments unsupported by the record evidence").

But as the Superior Court noted, the trial court instructed the jury that "the speeches of counsel are not a part of evidence and … you should not consider them as such," (Tr. Feb 26 No. 1 92:20–22), which is useful to cure improper behavior because we trust juries to follow their instructions, *see Darden v. Wainwright*, 477 U.S. 168, 182 (1986) (holding prosecutor's conduct did not create due process violation in part because "the trial court instructed the jurors several times that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence"). Plus, as previously explained, the evidence of Gaynor's guilt was substantial, so a reasonable jurist could conclude that any improper implication by the prosecutor was insignificant in the context of the trial as a whole.  *See Marshall v. Hendricks*, 307 F.3d 36, 69 (3d Cir. 2002) ("the stronger the evidence against the defendant, the more likely that improper arguments or conduct have not rendered the trial unfair").

The Superior Court reasonably concluded that any objection on due process grounds to the prosecutor's closing remarks would have been meritless, and trial

counsel could not have been ineffective for failing to raise meritless objections. *Bui*, 795 F.3d at 366–67.

IV

A certificate of appealability should only be issued if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The petitioner must "demonstrate that reasonable jurists would find the District Court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Gaynor has made no such showing, so no certificate should issue.

An appropriate Order follows.

BY THE COURT:

**<u>/s/ Gerald J. Pappert</u>**

Gerald J. Pappert, J.